# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| BYRON ARMFIELD ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 04 C 0691 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| JOHN E. POTTER, Postmaster General, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION & ORDER

Armfield has filed several Title VII claims, alleging that he was discriminated against based on race, color, gender, and disability, and also that he was retaliated against for filing EEOC charges. The Postmaster General ("the Post Office") moves for summary judgment on all counts, and Armfield argues only that genuine issues of material fact remain on his race discrimination claim.[1] Armfield does not respond to any of the defendant's arguments regarding gender, disability, or retaliation under Title VII, and the court assumes, therefore, that he does not oppose the dismissal of those claims.[2] For the reasons stated below, the court grants the Post Office's motion for summary judgment.

### I. BACKGROUND

**A. Undisputed Facts**

The undisputed facts of this case are as follows. Armfield, a black male, was employed with the Post Office as a mail carrier beginning in October 1989. During his

---

[1] Armfield refers to his race discrimination claim as a "race and color" discrimination claim in his complaint and in his briefs. The court refers to this claim as a race discrimination claim for simplicity.

[2] Armfield also admitted that he has "no basis to believe he was terminated due to his gender." (Pl. Resp. to Def. 56.1 Statement at 9 ¶ 41.)

tenure at the Post Office, Armfield had, on several occasions between 1994 and 1999, received discipline for attendance problems and other violations of the Post Office's policies. Armfield's direct supervisor, Carone Pierce, who is also black, typically signed off on these discipline writeups along with Postmaster Sommers, who is white. Pierce and Armfield saw each other socially and worked together for years.

On February 9, 1999, Armfield was issued a notice of removal by the Post Office for his failure to maintain a regular schedule during the period of September 3, 1998 through February 2, 1999. This notice was signed on behalf of Pierce, who gave Armfield the letter. On March 1, 1999, Armfield filed a union grievance, and the issue was settled through mediation such that Armfield received only a two-week suspension and was allowed to return to work as of August 14, 1999. Colleen Kelly, a labor relations specialist for the Post Office, authorized this action.

Slightly before Armfield was to return to work, however, he was in a car accident and injured his back. Armfield obtained a note from his doctor dated August 2, 1999, which stated that Armfield was under his doctor's care and that Armfield was "advised to refrain from work for the next 2 weeks." (Pl. Ex. E. to 56.1 Statement) Armfield did not provide this letter to the Post Office. (*See* Armfield Dep. at 48.). Armfield contacted Kelly at some time before August 14th to inform her that, as a result of his injuries, he would be unable to return to work on that date as originally planned. Kelly then told Armfield that he would need to provide the Post Office with a doctor's note to excuse any absence that would last more than three days, but whether or not Armfield was told that he needed to provide this note immediately or upon his return to work is disputed.[3]

---

[3] While the Post Office argues that Armfield was required to provide the note immediately, Armfield testified in his deposition that Kelly told him during their telephone conversation that, "[w]hen

2

Armfield assumed that "Ms. Kelly would make Mr. Sommers and whomever else needs to know aware of the outcome of" his previous conversation with Kelly where he had told her that he had been injured. (*Id.*)

Armfield failed to return to work on August 14, 1999. In response, the Post Office sent certified letters to Armfield at 4521 S. LeClaire Avenue in Chicago ("the LeClaire Address") on September 9, 1999 and September 20, 1999, indicating its intent to terminate Armfield if he did not provide medical documentation justifying his absences. Armfield did not receive either of these letters, as indicated by certified mail receipts that were unsigned and returned to the Post Office. The LeClaire Address was the address that Armfield had placed on file with the Post Office, and he also provided this address to the Department of Labor, the EEOC, and other entities throughout 1999 and 2000. Armfield admits that he received at least some pieces of mail from these other entities at the LeClaire Address in 1999 and 2000, such as documentation relating to his worker's compensation claim and a letter from the EEOC.

However, Armfield contends that he moved from the LeClaire Address to Palos Hills before the Post Office sent him its notices of its intent to terminate. But Armfield never followed the Post Office's procedures to formally change his mailing address. Nothing in the record indicates that Armfield provided a Palos Hills address for any official purposes. Pierce testified that he was aware that Armfield moved somewhere else but that (1) the LeClaire Address was the only address that the Post Office had and (2) the Post Office is required to mail official documentation to an employee's address of

---

you return to work, bring a doctor's statement," (Armfield Dep. at 45) and "[w]hen your doctor releases you, just bring the paperwork in." (*Id.* at 37.) Kelly states in an affidavit that she "instructed Armfield that if he does not report to work on August 14, he must provide adequate medical documentation to my office or to his supervisor to support his absence beginning on August 14, 1999." (Def. Ex. 9 to 56.1 Statement, ECF No. 56.)

record. In addition to the letters, Armfield's supervisors placed multiple calls to Armfield to ask him to return to work, but they were unable to reach him.

On October 22, 1999, the Post Office sent another notice of removal to Armfield at the LeClaire Address, and Armfield's mother signed for that notice on November 22, 1999. In this notice, the Post Office stated that Armfield was to be terminated as a result of his being "Absent Without Official Leave" (AWOL). The notice stated that, even though Kelly had told Armfield that he was "required to submit acceptable medical documentation . . . to cover [his] absence," Armfield had "failed to contact this office or submit any [medical] documentation as required." In addition, the notice referred to several of Armfield's previous disciplinary infractions that occurred from July 1994 to November 1998, which were considered by the Post Office in making its termination decision. The letter informed Armfield of his right to file a union grievance within fourteen days of receipt. He did not file such a grievance.

Armfield returned to work on or about January 24, 2000. Armfield had not provided written medical documentation to the Post Office before he returned to work or upon his return to work. By letter dated January 28, 2000, the Post Office notified Armfield that his removal would be effective February 5, 2000, since he had neither filed medical documentation with the Post Office nor a grievance with his union. This action was authorized by Lisa Ward on behalf of Pierce and Postmaster Sommers. However, when the Post Office sought to obtain his signature on the notice of removal, Armfield refused to sign it.

The record contains a letter from Armfield's doctor stating that he was disabled from June 19, 1999 through January 23, 2000, which covers the entire duration of

Armfield's absence from the Post Office, but that letter is dated February 20, 2000,[4] nearly a month after Armfield's return to work and over two weeks after Armfield's termination date of February 5, 2000.

After the Post Office fired Armfield, he filed an administrative EEO complaint on April 19, 2000. The EEOC issued a decision denying his claim and granting the Post Office summary disposition on all counts on October 1, 2002. The Post Office formally adopted this decision on October 4, 2002, and Armfield's administrative appeal was denied on October 23, 2003. Armfield then filed this suit on January 28, 2004.

**B. Contested Facts Not Genuinely in Dispute**

Some facts, while contested between the parties, are not genuinely in dispute. Although Armfield testified that Postmaster Sommers directed Pierce to write Armfield up and fire him, Armfield's testimony is unsupported by admissible evidence. First, Armfield does not make this claim based on his own personal knowledge. Armfield admitted during his deposition that his testimony regarding Sommers' efforts to fire him was "speculation" and that he "didn't hear it come out of [Sommers'] mouth himself." (Armfield Dep. at 17.) Second, Armfield relies on inadmissible hearsay: Armfield's testimony that Sommers directed Pierce to discipline him was based on statements from other Post Office employees who told Armfield that Sommers told them that Armfield was not "getting [his] job back." (*Id.*) Besides the fact that this alleged statement by Sommers does not support Armfield's contention that Sommers directed Pierce to discipline Armfield, none of these employees provided corroborating evidence by affidavit or deposition.

---

[4] The doctor's note also could be read to say February 20, 2001.

5

Other facts in the record, meanwhile, contradict Armfield's testimony that Sommers directed Pierce to write him up and fire him. Armfield admitted during his deposition that Pierce did not discriminate against Armfield on the basis of race. (*Id.* at 15-16.) Yet Pierce, who unlike Armfield had personal knowledge of Sommers' directives, controverted Armfield's account. Pierce testified that the supervisors handled their own discipline, that the postmaster often signed off on supervisors' discipline decisions as a formality, and that Sommers never said anything to him evincing a desire to discipline or discharge Armfield. (Pierce Dep. at 31-33.)

Moreover, the Post Office did not violate its own policy in including Armfield's past disciplinary infractions in its Notice of Removal. This policy requires the Post Office to purge certain disciplinary violations that are more than two years old, provided that the employee requests in writing that such records be removed. (*See* Pl. Ex. K.) No evidence in the record indicates that Armfield ever made such a written request. More importantly, the policy authorizes the purging of records upon written request only if, in the intervening two years, "there has been no disciplinary action initiated against the employee in that two year period."[5] Armfield never had an infraction-free period lasting two years or longer that would have allowed him to take advantage of this provision.[6] Thus, the Post Office's compliance with its own policy in including Armfield's prior disciplinary infractions in its notice of removal is not genuinely in dispute.

---

[5] Armfield admitted that the policy only applies where an employee goes "for two years without any incidents happening." (Armfield Dep. at 40.)

[6] Prior to his termination, Armfield committed disciplinary infractions in July 1994, August 1994, February 1995, August 1996, July 1998, November 1998, and February 1999. He could not have possibly made a written request at any time that would have enabled him to purge these violations from his record.

**C. Genuinely Disputed Facts**

Other issues, however, remain in dispute. First, Armfield testified that Sommers made a comment during his welcome speech to the Maywood Post Office staff, where he told an almost entirely black[7] post office that "[a] lot of you people will not be here." (Armfield Dep. at 16.) Armfield argues that the statement evinces racial animus. Second, Armfield testified that Sommers fired three black employees at Maywood on the same day; the Post Office argues that at least one of these employees has been reinstated and that Armfield provides no evidence that the employees were all fired in one day. There is also a dispute over whether Sommers repeatedly walked out of a mediation session to resolve Armfield's 1999 union grievance, which Armfield contends exhibits disrespect attributable to racial prejudice. Additionally, the parties dispute whether Colleen Kelly told Armfield he needed to furnish a doctor's note to the Post Office before he returned to work. Finally, there is a genuine dispute over whether Sommers told Dyers, another one of Armfield's supervisors, to write Armfield up on an occasion where Armfield arrived to work a few minutes late.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing a motion for summary judgment, the court should view all evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, the party who bears the burden of

---

[7] The parties agree that the Maywood Post Office, at the relevant time, was approximately 78% black.

proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). The evidence presented must comport with the Federal Rules of Evidence and be admissible at trial, *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), and it must consist of affidavits or declarations "made on personal knowledge, set[ting] out facts that would be admissible in evidence, and show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).[8]

### III. ANALYSIS

To avoid summary judgment on a Title VII race discrimination claim, Armfield "must either point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue (the 'direct' method) or establish a prima facie case under the *McDonnell Douglas* formula (the 'indirect' method)." *Egonmwan v. Cook Cty. Sheriff's Dept.*, 602 F.3d 845, 849-50 (7th Cir. 2010).

**A. Indirect Method of Race Discrimination**

There is no triable issue of fact with regard to the indirect method of proving race discrimination in this case. The prima facie case under the indirect method requires Armfield to show that (1) he is a member of a protected class; (2) his job performance met the Post Office's legitimate expectations; (3) he suffered an adverse employment action; and (4) the Post Office treated another similarly situated individual outside his protected class more favorably. *See id.* at 850. Armfield admits that his case does not rely

---

[8] When a federal employee files a Title VII suit in federal court, the district court charged with deciding that action is required to perform a *de novo* review of the record, including administrative agency proceedings. *See Smith v. Potter*, 445 F.3d 1000, 1011 (7th Cir. 2006). Thus, the court does not accord any deference to the administrative decisions below, and the court treats this as it would any other summary judgment motion.

on any evidence of similarly situated white employees who were treated more favorably than he was. (*See* Pl. Resp. to Def. 56.1 Statement ¶ 42). Thus, it is impossible for Armfield to present a triable case under the indirect method.

**B. Direct Method of Race Discrimination**

Armfield nonetheless argues that a genuine issue of material fact remains under the direct method of proving race discrimination. Armfield has no direct evidence of discriminatory motivation on the part of Sommers. Under the direct method, however, one can also demonstrate that an employer has a race-based motivation for terminating an employee using a "convincing mosaic" of circumstantial evidence. *See Winsley v. Cook Cty.*, 563 F.3d 598, 604 (7th Cir. 2009). Thus, there are instances where "[a] plaintiff will prevail on summary judgment where the individual pieces of evidence are weak but, taken together, allow an inference that a plaintiff was fired because he was a member of a protected class." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008); *Phelan v. Cook Cnty.*, 463 F.3d 773, 780 (7th Cir. 2006).

The Seventh Circuit allows plaintiffs to piece together a convincing mosaic of circumstantial evidence of intentional discrimination using three types of evidence: (1) evidence such as "'ambiguous statements, suspicious timing, [or] discrimination against other employees'"; (2) "comparative evidence showing that employees similarly situated to the plaintiff other than in the protected characteristic received systematically better treatment"; and (3) "pretext evidence, where the plaintiff is qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference [in treatment] is unworthy of belief." *Kennedy v. Schoenberg, Fisher, & Newman, Ltd.*, 140 F.3d 716, 724-25 (7th Cir. 1998) (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734,

736 (7th Cir. 1994)). As noted above, Armfield adduces no evidence about similarly situated white employees outside of Armfield's protected class. Therefore, the court considers only the first and third categories of circumstantial evidence. *Cf., e.g.*, *Hasan*, 552 F.3d at 529-30 (applying the direct method to analyze circumstantial evidence under the first and third categories where a plaintiff "had not produced any evidence" regarding similarly situated employees outside of the plaintiff's protected class).

1. Sommers' Conduct

Armfield argues that circumstantial evidence of Sommers' statements and behavior suggests that he had a discriminatory motivation in authorizing Armfield's termination. First, Armfield argues that Sommers made a racially suggestive comment when he told employees of the Maywood Post Office that "[a] lot of you people will not be here." Second, Armfield argues that Sommers fired three black employees from the Maywood Post Office on the same day. Third, Armfield argues that Sommers directed supervisors to write him up, that Armfield's union representative told him that Sommers wanted Armfield fired, and that Sommers disrespectfully walked out of Armfield's mediation sessions for his 1999 union grievance.

While the evidence regarding Sommers' statement to the Maywood Post Office is in dispute, the court assumes for the purposes of this motion that Armfield's account is true. Even assuming that Sommers said "[a] lot of you people will not be here" to staff members of the Maywood Post Office, the statement does not evince racial animus. First, Armfield alleges that Sommers made this remark to the entire Post Office during his welcome speech as postmaster; although most of the Maywood post office is black, this comment was also made to at least some white and Hispanic employees. While the

comment may suggest that Sommers expected to terminate many employees, it suggests nothing about any intention on the part of Sommers to single out black employees. The comment is at best an ambiguous or stray remark, which cannot be construed to be evidence of racial animus. *See, e.g., Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007) ("[S]tray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment.").

Armfield's allegation that Sommers fired three black employees on the same day, even if true, fails to indicate that Sommers had racial motivation in firing him. First, the record suggests that at least one of the three allegedly fired employees was reinstated. Second, even if all three employees were permanently fired, the parties concede that 78% of the employees at the Maywood post office were black. Thus, on any day where three employees are fired from the Maywood post office, it is statistically likely that all of these employees will be black (Armfield concedes that the statistical likelihood is approximately 48%). This is not an instance where an employer employed only a few members of a protected class and fired or disciplined only those employees, as in the case cited by Armfield. *See, e.g.*, *Hasan*, 552 F.3d at 525 (noting that, other than Hasan, the business law department at Hasan's law firm employed only two other Muslim associates, one of whom was placed on probation and the other of whom was terminated). Here, where the vast majority of employees are black, it is likely that most fired employees are black based on probability alone. Armfield significantly adduces no evidence that any of these other employees was fired for racially discriminatory reasons.

Armfield also challenges other aspects of Sommers' behavior. But these allegations do not find support in the record or are inadmissible. While Armfield alleges

that Sommers directed Armfield's supervisors to write him up at times, this did not apply to Pierce, who ultimately authorized Armfield's termination along with Sommers. Pierce testified that he, not Sommers, decided when mail carriers were disciplined. (*See* Pierce Dep. 15-16.) (noting that the supervisors take care of the discipline and tell the postmasters what they want done). Given this evidence, and the fact that Armfield did not have any direct, personal knowledge of Sommers' alleged efforts to force Pierce to write Armfield up, there is no material dispute on this issue. Even assuming that Sommers told Dyers, another supervisor, to write Armfield up when he was late at one point, that allegation is not coupled with any evidence of race-based motivation, nor does Armfield suggest that he was not in fact late.[9]

Armfield also argues that his union representative told him that Sommers wanted Armfield fired. This evidence is hearsay and, even if true, does not suggest any racial animus on the part of Sommers. It is just as likely that Sommers wanted Armfield fired due to Armfield's persistent attendance problems, not due to racial reasons. The same is true of Sommers' alleged denial of Armfield's step two union grievance and his conduct during Armfield's 1999 mediation. Armfield provides no reason why either a denied union grievance or Sommers' intermittent absences from a mediation session would allow this court to infer any race-based motivations on Sommers' part.[10] Assuming Sommers actually denied Armfield's grievance, Armfield provides no reason why, given his discipline history, Sommers could not have been genuinely concerned about Armfield's attendance problems; as to the latter, the most likely explanation for this

---

[9] Indeed, Armfield's brief concedes that "Armfield came to work a few minutes late." (Br. in Opp. to Summ. J., ECF No. 60, at 9.)

[10] The court further notes that Armfield failed to file a union grievance in January 2000, (*see* Ex. 12 to Defendant's 56.1 Statement, ECF No. 56.) so Armfield's claim that such a grievance was denied by Sommers appears to be without merit.

behavior was that Sommers, as the Postmaster, was busy and had to tend to other business at points during the meeting. Armfield admitted as much. (*See* Armfield Dep. at 20 (testifying that "Mr. Sommers said, 'Well, I have some people coming by to see me today.'").) Nothing in the record suggests that Sommers was required to attend entire mediation sessions.

In sum, the evidence of Sommers' words and conduct proffered by Armfield falls short of a convincing mosaic of circumstantial evidence of intentional discrimination.

2. Termination as Pretext for Racial Discrimination

Under the direct method, Armfield can provide circumstantial evidence showing that the Post Office's reasons for firing him were pretextual, and he argues that there is enough evidence of pretext to survive summary judgment. Here, pretext would involve evidence showing that Armfield was qualified to keep his job with the Post Office, yet the Post Office still chose to fire him based on a reason that is "unworthy of belief." *See Hasan*, 552 F.3d at 527 (citing *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 725 (7th Cir. 1998)). Armfield must provide evidence suggesting that the proffered reason for removing him was "a lie – not just an error, oddity, or oversight." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010) (citing *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010)).

In support of his pretext argument, Armfield argues that (1) many of the stated reasons for firing him were lies insofar as many of Armfield's past discipline violations should have been purged from his employee file, and (2) the primary reason for his termination—that he was AWOL—was not legitimate.

### a. Armfield's Past Disciplinary History

On the first issue, the Post Office's consideration of Armfield's past discipline violations was not pretextual. Armfield's argument regarding the Post Office's policy is without merit because he misunderstands the policy. The Post Office policy allows the purging of disciplinary violations that are more than two years old only if the employee has a continuous, two year period without a disciplinary violation. As noted above, Armfield never had a discipline-free two year period between 1994 and 2000 that would have allowed him to purge his prior violations. He also did not request the purging of discipline records from his file in writing, as required. Thus, the Post Office did not violate its own policy, and Armfield cannot argue that the Post Office's consideration of these past disciplinary violations was pretextual.

### b. Armfield's Status as "Absent Without Official Leave"

Armfield also challenges whether the Post Office honestly believed that he was AWOL throughout his absence. Armfield first argues that, "while his job status was still being negotiated, Plaintiff brought [the August 2nd] doctor's note to the Maywood post office in order to apprise them of his injury from the car accident." (Pl. Br. in Opp. at 3.) Additionally, a dispute remains over whether the Post Office—through Colleen Kelly— told Armfield that he needed to provide medical documentation to the Post Office before or upon his return to work. Finally, Armfield points out that because two of the Post Office's notices of intent to remove came back to the Post Office undelivered, the Post Office did not undertake adequate efforts to ensure that Armfield understood that he needed to provide medical documentation.

Despite these arguments, the Post Office's decision to consider Armfield AWOL was not pretextual. Armfield admitted at his deposition that "no one" at the Post Office received "documentation from [his] doctor [stating] that [Armfield] could not return to work on August 15 or thereabouts." (*See* Armfield Dep. at 48.) Moreover, even had Armfield provided the August 2, 1999 doctor's note to the Post Office before August 14, 1999, the note cleared him to be absent from work for only two weeks, which meant that he still needed to provide documentation explaining his absences after August 16, 1999. No such documentation is in the record except for the note which was dated almost a month after Armfield returned to work.

The factual dispute concerning when Colleen Kelly told Armfield to bring in a doctor's note is irrelevant. Whether or not Kelly indicated that Armfield needed to provide documentation before or upon his return to work, Armfield did neither. Armfield returned to work on or about January 24, 2008. He refused to sign his notice of termination on January 28, 2000. The notice indicated that his termination would be effective February 5, 2000. Despite this, Armfield did not provide any medical documentation to the Post Office before he was terminated. As stated above, the only medical documentation in the record that covers Armfield's entire absence from the Post Office is dated February 20, 2000. Armfield has not challenged the Post Office's need for medical documentation, and it is clear that, regardless of when he was required to turn it in, he failed to do so.

Armfield's argument that the Post Office failed to take adequate steps to notify him of its intent to remove him is also without merit. First, an employer has no duty to track down an employee who has failed to provide a proper address, especially where that

employee has not taken steps to update his file. *See Jolicoeur-Vasseur v. Assn. of Prof. Flight Attendants*, 405 F. App'x 66, 70 (7th Cir. Dec. 22, 2010) (noting that employers are not "to blame" when an employee failed to receive a termination letter after the employee had "fail[ed] to change her address" within an employer's database). Here, Armfield provided the Post Office with the LeClaire Address, and he never undertook any efforts to formally change that address by following Post Office procedures. The Post Office, meanwhile, mailed at least three notices to Armfield at the LeClaire Address, one of which was received by his mother. The Post Office also called this residence.

In sum, Armfield has not raised a genuine issue of material fact suggesting that the Post Office's stated reason for Armfield's termination, that he was AWOL, was somehow "unworthy of belief," *see Hasan*, 552 F.3d at 527. No reasonable trier of fact could find that the Post Office lied in deciding to terminate Armfield.

For the reasons stated above, therefore, no genuine issue of material fact remains on the issue of pretext. None of Sommers' statements or conduct, even when taken as true, adequately show that Sommers signed off on Armfield's final termination for racial reasons. Thus, Armfield will be unable to adduce a "convincing mosaic" of circumstantial evidence at trial suggesting that the Post Office, in terminating Armfield, was motivated by race. Accordingly, summary judgment is granted to the Post Office on Armfield's race discrimination claim.

## IV. CONCLUSION

The Post Office's motion for summary judgment is granted as to all counts.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: January 12, 2012